ATLANTIC RICHFIELD COMPANY,
Plaintiff-Appellee,

v.

Frank G. ZARB, Administrator, et al.,
Defendants-Appellants.

No. 3–11.

Temporary Emergency Court of Appeals.

Argued March 19, 1976.

Decided April 7, 1976.

Christopher M. Was, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, were on the brief for defendants-appellants.

Richard E. LaFarge, Dechert Price & Rhoads, Philadelphia, Pa., with whom Robert M. Landis and Alfred A. Gollatz, Philadelphia, Pa., were with him on the brief for plaintiff-appellee.

Before TAMM, Chief Judge, and ESTES and HASTINGS, Judges.

ESTES, Judge:

On August 1, 1970, William M. Razumic and Atlantic Richfield Company (ARCO) entered into a lease agreement whereby Razumic became the lessee of a service station owned by ARCO, located at 3754 Wm. Penn Highway, Monroeville, Pennsylvania. The lease term was three years, subject to termination by the lessee on any annual anniversary date by giving 60 days' advance written notice to the lessor. The parties also entered into a Motor Fuel Purchase Agreement, on April 10, 1972, which enabled Razumic to purchase motor fuels from ARCO on a load-to-load basis. This agreement was to expire July 31, 1973, or at any earlier date on which any contract dealer agreement or dealer lease ceased to be in effect. Unless notice to the contrary was given at least 30 days before the expiration of the initial term, the motor fuel agreement would be automatically extended for additional one-year terms, subject to the termination of the agreement due to the expiration or termination of a contract dealer agreement or dealer lease.

In June, 1973, Razumic was notified by ARCO that the service station operated by him, pursuant to the August 1, 1970 lease, would not be leased for a new term, and possession of the site was requested upon the July 31, 1973 expiration date of the lease. There is no question on the record before this court that after July 31, 1973 Razumic had no lawful right to either possession of the lease premises or use of the service station facilities. Razumic's refusal to vacate the station site after his lease expired forced ARCO to resort to state court remedies.

■■■ After a hearing on the Landlord and Tenant Complaint filed by ARCO with the Justice of the Peace of the Borough of Monroeville, Pennsylvania, a judgment was entered by that court on August 29, 1973, awarding possession and damages for unlawful detention to ARCO against Razumic. This judgment was appealed by Razumic, and he filed a bond which stayed execution of the judgment. Thereafter, ARCO filed a complaint in ejectment in the Court of Common Pleas. At the trial by jury, in June, 1974, the court instructed the jury at the close of the evidence to return a verdict for possession in favor of ARCO. The court entered a compulsory nonsuit in ARCO's favor on the counterclaim asserted against ARCO by Razumic. Motions for a new trial were denied, on October 14, 1975, and Razumic appealed the judgment to the Superior Court of Pennsylvania, staying execution of this judgment by posting a bond.[1]

---

1. Under Pennsylvania law, "a lease for a definite term expires by its own limitation and it is incumbent upon the tenant, without notice to quit, to surrender the premises. *Sterle v. Galiardi Coal & Coke Co.*, 168 Pa.Super. 254, 77 A.2d 669 (1951)." *Hollander v. American Oil Company*, 329 F.Supp. 1300, 1302 (W.D.Pa. 1971). The posting of a supersedeas bond does not grant any possessory interest or right of use of the property in dispute. As the appellees correctly contend in their brief, the supersedeas operates "only . . . upon the right of execution . . . not . . . upon the judgment . . . [which is] a conclusive adjudication of the rights of the parties to the lease, until it [is] reversed." *Usnick et ux. v. Pittsburgh Terminal Coal Corp.*, 305 Pa. 355, 358, 157 A. 787, 788 (1931).

On July 25, 1974, the Federal Energy Administration[2] (FEA) issued a Notice of Probable Violation to ARCO pursuant to 10 CFR § 205.191. The Notice stated: "It is felt that there still exists a supplier/wholesale purchaser reseller relationship between ARCO and Mr. Razumic" and that ARCO might be in violation of the FEA regulations by failing to supply Razumic with gasoline at the ARCO service station which Razumic was occupying. ARCO replied to the Notice and requested a conference pursuant to 10 CFR § 205.191(e).

> Further, in *Taylor v. Kaufhold*, 368 Pa. 538, 84 A.2d 347, 350 (1951), where an assignee held over after the expiration of his lease and remained in possession of the premises by virtue of a supersedeas bond filed to perfect his appeal from an ejectment judgment rendered against his assignor which named him as terre tenant, the Supreme Court of Pennsylvania stated:
>
> > It is obvious . . . that [the assignee] Kaufhold's retention of possession of the demised premises, after the expiration of the lease, was morally, equitably and legally unjustifiable.

2. The Federal Energy Administration, established by the Federal Energy Administration Act of 1974 (FEA Act), 15 U.S.C. § 761 et seq. (1976 Supp.), and empowered with all of the Presidential authority embodied in the Emergency Petroleum Allocation Act of 1973, as amended (Allocation Act), 15 U.S.C. § 751 et seq. (1976 Supp.), by section 2(a) of Executive Order No. 11790, 39 F.R. 23185 (June 27, 1974), succeeded the Federal Energy Office which had originally administered the Allocation Act pursuant to section 3(a) of Executive Order No. 11748, 38 F.R. 33575 (December 6, 1973).

3. Subpart A of 10 CFR part 211 provides, at § 211.9:

> (a) Supplier/wholesale purchaser relationship. (1) Each supplier of an allocated product shall supply all wholesale purchaser-resellers and all wholesale purchaser-consumers which purchased or obtained that allocated product from that supplier during the base period as specified in Subparts D through K of this part.
>
> (2)(i) Unless otherwise provided in this part or directed by FEO, the supplier/wholesale purchaser-reseller relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without the express written approval of FEO.

Following the informal conference between ARCO and FEA officials, held on August 2, 1974, the FEA issued its Remedial Order to ARCO on September 19, 1974. FEA's position in issuing the Remedial Order to ARCO was that under 10 CFR § 211.-9(a),[3] ARCO was the base period[4] supplier of William M. Razumic and that by reason of ARCO's failure to supply Razumic with motor gasoline at the ARCO service station after August 1, 1973, ARCO was in violation of 10 CFR § 211.9 and 10 CFR § 211.11.[5] ARCO filed an appeal from the

> A wholesale purchaser-reseller is defined by 10 CFR § 211.51 as "any firm which purchases, receives through transfer, or otherwise obtains (as by consignment) an allocated product and resells or otherwise transfers it to other purchasers without substantially changing its form."
>
> A wholesale purchaser-consumer is defined by 10 CFR § 211.51 as:
>
> > any firm that is an ultimate consumer which, as part of its normal business practices, purchases or obtains an allocated product from a supplier and receives delivery of that product into a storage tank substantially under the control of that firm at a fixed location and which either (a) purchased or obtained more than 20,000 gallons of that allocated product for its own use in agricultural production in any completed calendar year subsequent to 1971; (b) purchased or obtained more than 50,000 gallons of that allocated product in any completed calendar year subsequent to 1971 for use in one or more multi-family residences; or (c) purchased or obtained more than 84,000 gallons of that allocated product in any completed calendar year subsequent to 1971.

4. Subpart F of 10 CFR part 211 provides that with respect to motor gasoline, the base period is that "month of 1972 corresponding to the current month." 10 CFR § 211.102.

5. Under 10 CFR § 211.11, which establishes the basis for a wholesale purchaser's entitlement to an allocation of motor gasoline under subpart F of 10 CFR part 211, a wholesale purchaser is entitled to receive an allocation so long as it conducts an ongoing business. A wholesale purchaser which has gone out of business is not eligible for an allocation based on any volumes of motor gasoline received by it prior to going out of business. 10 CFR § 211.11(a), (c).

Based upon findings that William M. Razumic was occupying an ARCO service station, that ARCO was the base period supplier of motor gasoline to Razumic, and that ARCO was not supplying Razumic with motor gasoline, the

Remedial Order with the FEA which was subsequently denied.[6]

On February 7, 1975, ARCO filed its complaint in the United States District Court for the Eastern District of Pennsylvania against the Administrator, Frank G. Zarb, and the Region III Administrator, Joseph A. LaSala, of the Federal Energy Administration, seeking a declaratory judgment that the Remedial Order issued by the FEA to ARCO on September 19, 1974, was in excess of the FEA's authority, not supported by substantial evidence, and otherwise invalid; and that ARCO had not violated and was not then in violation of the Emergency Petroleum Allocation Act of 1973, as amended (Allocation Act), 15 U.S.C. § 751 et seq. (1976 Supp.), or any regulations promulgated by the FEA pursuant to such Allocation Act, by reason of ARCO's refusal to supply motor gasoline to a service station which was owned by ARCO and at which a former ARCO lessee was wrongfully holding over after the expiration of the lease term. The complaint also sought a permanent injunction compelling the FEA to set aside the Remedial Order and preventing the FEA from taking any action to enforce the Remedial Order.

The FEA answered the complaint and counterclaimed against ARCO on behalf of the United States of America, which was joined as a party by order of the district court, on April 29, 1975, for civil penalties for violation of its regulations and for injunctive relief compelling ARCO to comply with its regulation. On August 15, 1975, ARCO filed its motion for summary judgment, and on October 9, 1975 the FEA filed a cross-motion for summary judgment.

This appeal is from the November 7, 1975 Order of the United States District Court for the Eastern District of Pennsylvania, which granted summary judgment in favor of ARCO on its complaint and denied the counterclaim asserted by the United States against ARCO. The FEA asserts that the only issues for our determination on this appeal are whether or not its Remedial Order of September 19, 1974 was supported by substantial evidence and issued pursuant to lawful agency authority.

■■■ The evidence in the record before this court does not support and it affords no basis for the issuance of FEA's Remedial Order of September 19, 1974 to ARCO. The Remedial Order, rather than setting forth "relevant facts and the legal basis" of the Order as required by 10 CFR § 205.-192(a),[7] states that Razumic "is presently occupying" the ARCO service station; that ARCO is the "base period supplier of record"; and that ARCO "has not and is not presently supplying Mr. Razumic" with gasoline and petroleum products. There are no other facts set forth in the Remedial

---

FEA issued its September 19, 1974 Remedial Order to ARCO, ordering the company to:
 1. Furnish Mr. William M. Razumic, ARCO Service Station, 3754 Wm. Penn Highway, Monroeville, Pennsylvania, immediately with the proper FEA 18, base year supply.
 2. Deliver to Mr. Razumic his allocation as required by Regulation 211.104.

**6.** *Atlantic Richfield Co.*, Case No. FEA-0278 (filed 10-25-74, decided 1-17-75), 1975 CCH Energy Management Transfer Binder ¶ 80,506.

**7.** It should be noted that the FEA failed to follow the requirements of its own regulations in issuing its Remedial Order to ARCO. Under 10 CFR § 205.192(a) a Remedial Order must include "a written opinion setting forth the relevant facts and the legal basis of the remedial order." This regulation obviously contemplates the recitation of greater facts justifying the imposition of penalties for the violation alleged in the Remedial Order than would be set forth in a Notice of Probable Violation. Section 205.191 of 10 CFR, which governs the issuance of Notices of Probable Violations, sets forth no such requirement of a written opinion. Actually, 10 CFR § 205.191 provides for the party receiving the notice to make a reply and affords the party an opportunity to request a hearing. The purpose of such provisions is quite clear. Before issuing a Remedial Order with which compliance is mandatory, the FEA must gather all facts and information available as to the alleged violation and allow the party an opportunity to present its side in a reply letter and at a conference with the FEA. These additional fact findings then may or may not constitute facts justifying the issuance of a Remedial Order; but if they do, 10 CFR § 205.-92(a) requires the statement of all such relevant facts supporting the issuance of the Remedial Order.

Order which demonstrate that ARCO is within the purview of the Allocation Act or its regulations with regard to Mr. Razumic.[8]

The Allocation Act was signed into law November 27, 1973, and regulations implementing the Act were issued on January 14, 1974. 39 F.R. 1924 (Jan. 15, 1974). Under section 4(a) of the Allocation Act, 15 U.S.C. § 753(a) (1976 Supp.), the President was directed to "promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product . . . ." In implementing this mandate, section 4(c)(1) of the Act, 15 U.S.C. § 753(c)(1) (1976 Supp.), required the allocation regulation, "[t]o the extent practicable and consistent with the objectives of subsections (b) and (d) of this section," to provide, subject to certain adjustments, for the allocation

> of each refined petroleum product to each branded independent marketer, [and]

each nonbranded independent marketer, . . . in an amount not less than the amount sold or otherwise supplied to such marketer or refiner during the corresponding period of 1972 . . . .

15 U.S.C. § 753(c)(1) (1976 Supp.).

■ Sections 3(1) and (2) of the Act, 15 U.S.C. § 752(1) and (2) (1976 Supp.), define branded and nonbranded independent marketers as persons "engaged in the marketing or distributing of refined petroleum products. . . ."[9] Congress obviously intended the scope of the authority conferred on the President to allocate petroleum products to encompass only those persons or entities engaged in supplying or marketing products at the time the Act was passed and not all persons who had marketed or distributed petroleum products at any time during the base period regardless of whether or not they were still in that business.[10]

---

**8.** After quoting 10 CFR §§ 211.9(a), (c), and 211.11(d) the Remedial Order simply states:

> Accordingly, Federal Energy Administration has concluded that a violation of Sections 211.9 and 211.11 of the Regulations has occurred. Therefore, pursuant to 10 CFR Section 205.86(b), Federal Energy Administration is issuing this Remedial Order.

While not set forth in the Remedial Order, 10 CFR § 211.11(a) states: "A wholesale purchaser or an end-user entitled to an allocation level shall receive an allocation based on its conduct of an ongoing business or maintenance of an established end use." Section 211.11(c) of 10 CFR, which was also not specifically referred to in the Order, states: "Wholesale purchasers and end-users which have gone out of business shall not be eligible for allocations based on volumes received or purchases made prior to going out of business." The subject of whether or not Razumic had conducted an on-going business since his base period purchases from ARCO was not addressed in the Remedial Order.

**9.** The regulation defining these terms 10 CFR § 211.51, is in accord.

**10.** In the Joint Explanatory Statement of the Committee of Conference, Conference Report 93–628, U.S.Code Cong. & Admin.News 1973, 93d Cong., 1st Session, Vol. 2, pp. 2688, 2689, the Conference Committee indicated its concern that "large integrated oil companies understandably protect their own interests first" in a period of shortage, and thus the Allocation Act "requires the mandatory allocation program to be so structured as to prevent major

oil companies from . . . favoring their directly-owned outlets over independent marketers in the sale or distribution of refined petroleum products." Thus there was explicit congressional concern for the nonintegrated sectors of the petroleum industry and their economic and competitive viability, and such was expressed in section 4(b)(1)(D) of the Allocation Act, 15 U.S.C. § 753(b)(1)(D) (1976 Supp.), which states that the regulation under section 4(a) shall, "to the maximum extent practicable," provide for the

> preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

> . . . . .

This concern did not extend as far as the appellants here would contend, however. As noted by the district court in *Guyer v. Cities Service Company*, 381 F.Supp. 7 (E.D.Wis. 1974), the Senate version of the bill contained provisions which would have materially restricted dealer lease and franchise terminations by petroleum refiners and distributors. The Conference Report, *supra*, at p. 2705, indicates that:

> Section 110 of the Senate bill further stated that a petroleum refiner or a petroleum distributor was not to cancel, fail to renew, or otherwise terminate a franchise unless the

FEA contends that 10 CFR § 211.9, which governs supplier/purchaser relationships, obligates ARCO to supply Razumic as directed in the Remedial Order. This regulation requires a supplier of an allocated product to

> supply all wholesale purchaser-resellers and all wholesale purchaser-consumers which purchased or obtained that allocated product from that supplier during the base period . . . .

Clearly, ARCO as a supplier is obligated under this regulation only to persons or firms qualifying as wholesale purchaser-resellers or as wholesale purchaser-consumers, supplied by ARCO. Razumic was not, at the time of the enactment of the Allocation Act nor at any relevant time thereafter, a wholesale purchaser-reseller or wholesale purchaser-consumer. To qualify as either, he would have had to fall within the definitions set forth at 10 CFR § 211.51, which clearly impose the requirement of current

> petroleum retailer or petroleum distributor whose franchise was terminated failed to comply substantially with essential and reasonable requirement of such franchise or failed to act in good faith in carrying out the terms of such franchise, or unless such refiner or distributor withdrew entirely from the sale of petroleum products in commerce for sale other than resale in the United States. However, in discussing the Conference substitute for the Senate and House bills, the Conference Committee said in their Conference Report, *supra*, at p. 2707:
>
>> Although the conferees have determined not to include the dealer protection provisions which were contained in the Senate bill, the committee wants to express its concern with the downstream vertical integration of the major oil companies into the distribution and retail levels of the market.
>
> And echoing the House Report on the bill, the Conference Report further stated:
>
>> Branded independent marketers, already under short term lease and supply agreements, are finding that their agreements are not being renewed. Leases of one year's duration are being converted to thirty days. Representatives of branded dealers believe that this represents an attempt by the majors to force private entrepreneurs out of the retail market and to convert station operators to salaried employees. The committee believes that the agency administering this Act and the Congress should watch this development

rather than historical purchases of an allocated product.[11]

The service station lease entered into by Razumic and ARCO expired by its own terms on July 31, 1973, and all right of Razumic to use and occupy ARCO's equipment and service station ended on that date. Thus ARCO's entire obligations to Razumic to supply motor gasoline, and facilities from which to market it, legally ended on July 31, 1973. Congress never intended to empower the FEA to recreate expired and nonexistent lease contracts or supplier/purchaser relationships. While granting the deference to the agency's expertise and construction of the Act which we have recognized as appropriate under the Allocation Act,[12]

> [t]his court cannot and will not close its eyes to the realities of the situation facing the agencies. If the haste necessitated gave rise to unreasonable inconsistencies in the administrative interpretations,

> closely. Should it be shown to be progressing in a manner which can not be dealt with under the allocation authority contained in this bill, it may be in order for the Congress to consider remedies such as proposed in the Senate bill or as may be appropriate in the formulation of tax, import and anti-trust policy.

Conference Report, *supra*, at p. 2707.

11. The Allocation Act and its implementing regulations were designed to continue in effect those relationships which were in existence at the time of the adoption of the Act. Razumic was not marketing or distributing petroleum products within the meaning of section 3(1) and (2) of the Act; nor was he purchasing, receiving through transfer, or otherwise obtaining allocated products and reselling them to others without changing the form of the product, as a wholesale purchaser-reseller, or consuming such products himself as a wholesale purchaser-consumer, 10 CFR § 211.51, at the time of the enactment of the Allocation Act or thereafter.

12. See *Cities Service v. FEA*, Em.App., 529 F.2d 1016 (1975), 3 CCH Energy Management ¶ 26,034, p. 26,275 at p. 26,282; *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1400–1404 (TECA 1975); *Condor Operating Company v. Sawhill*, Em. App., 514 F.2d 351, 359 (1975), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

or to actions plainly without the purpose and scope of the [Executive] Order, then we will readily rectify them.

*University of Southern California v. Cost of Living Council*, Em.App., 472 F.2d 1065, 1069 (1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

 And where, as here, burgeoning administrative agencies have arrogated to themselves power to control private property, unauthorized by the plain language and obvious purposes of the Acts involved, and contrary to Congressional intent clearly expressed in the legislative history of such Acts and also to decisional law, it is our duty to restrain them.

 The FEA maintains that Razumic is entitled to an allocation because he is currently in possession of a service station site [13] and that ARCO must deliver gasoline to that site regardless of the fact that Razumic's possession has been judicially determined to be unlawful. Regardless of the rhetoric chosen by the FEA, its remedial order implies authority to direct and control the continued use of ARCO's service station site.

Not only does the Act fail to provide such authority on its face, but this specific issue was determined in *Shell Oil Co. v. FEA*, Em.App., 527 F.2d 1243 (1975), adversely to the FEA's position. The FEA in its reply brief, at page 2, indicates that the rental price regulations at issue in the *Shell* case were struck down by this court as being overly broad. However, the overly broad character of the regulations was cited by the court merely as an indication of the failure of the rental price regulations to support even the FEA's own rationale for their existence. As to the validity of the regulations and the FEA's authority over real property used in the merchandising of motor gasoline, the court stated: "The FEA's regulations, 10 CFR §§ 212.101–103, . . . attempt to regulate under the Allocation Act the rent chargeable for the use of real property, which the FEA has no authority to allocate." *Shell Oil Co. v. FEA, supra*, 527 F.2d at 1246. The FEA simply has no authority to regulate directly or indirectly the use of real property, or the leasing of service station property.

A comprehensive analysis of the legislative background in this respect appears in *Guyer v. Cities Service Company*, 381 F.Supp. 7 (E.D.Wis., 1974). In *Guyer*, the plaintiffs received notices from the defendant that their respective service station and equipment leases would not be renewed. All of the expiration dates were after the enactment of the Allocation Act. Noting that the provision in the Senate version of the Allocation Act which would have provided protection to dealers from the termination or refusal to renew lease and franchise agreements was specifically excluded from the final Act as passed by Congress, the court stated:

> The FEA appears to rely at least in part on 10 CFR § 211.106(c), which raises a presumption that if a wholesale purchaser-reseller vacates its retail sales outlet, it has gone out of business at that site. From this regulation, the FEA would impose the irrebutable presumption in this case that if the retail sales site is not vacated, then the wholesale purchaser-reseller has not gone out of business. This would require the court to be completely oblivious to the facts of this case which clearly indicate that Razumic has been out of the business of marketing motor gasoline since August 6, 1973; that his continued occupancy of the ARCO service station is unlawful and has been so determined by Pennsylvania state courts; and that the vacation of the site should and would have occurred on July 31, 1973, but for Razumic's wrongful acts.

---

**13.** The record before us provides no substantial evidence or reasonable basis for concluding that Razumic is entitled to any allocation. *I. B. E. W. v. Boldt*, Em.App., 513 F.2d 1405, 1406 (1975). His lease expired on July 31, 1973, six months before the instant regulations were adopted and three months before the Allocation Act was passed. No gasoline has been sold by Razumic at the leased site in dispute since August 6, 1973. The fact that he kept the service station open for repair service and refused to vacate after the lease expired by its own terms is no indication to this court that by so doing Razumic was conducting an on-going business of marketing gasoline up until the enactment of the Allocation Act, or that he was intended to be within the mandatory allocation scheme envisioned by Congress.

[E]ven if plaintiffs could show that the practical effect of the termination of the leases would be to end their allocations, they still could not prevail. . . .

The difficulties of relocating and the possible loss of allocations were risks which Congress and the FEA placed on "independents" such as plaintiffs. To require Citgo to forego termination of the leases because plaintiffs might lose their allocations would be to indirectly regulate the termination of leases, something which Congress had determined not to do directly. To read the regulations as requiring FEA regulation of lease terminations when Congress had decided not to forbid such terminations would turn the legislative system on its head. It is axiomatic that an administrative agency can only adopt regulations which comply with Congress' intent. *Dixon, et al., v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965).

381 F.Supp. 11.

In *Russell v. Shell Oil Company*, 382 F.Supp. 395 (E.D.Mich.1974), *affd.*, 497 F.2d 924 (6th Cir. 1974), the court rejected the claims of the plaintiff there that the defendant's failure to renew his dealer agreements which expired November 30, 1973 violated the Petroleum Allocation and Price Regulations. The court found that inasmuch as the notice that the defendant would not renew the agreements was issued prior to enactment of the Allocation Act, there could be no finding of any retaliatory action by Shell in violation of 10 CFR § 210.61 and that

> the fact that the lease and dealer agreement between the parties here expired by their own terms would appear to be within the contemplation of Section 211.24(d), which permits suppliers and purchasers to terminate their relationship by mutual agreement.

382 F.Supp. at 398. Similarly, the court in *Burk v. Gulf Oil Corp.*, 397 F.Supp. 421 (D.Mont.1975), found that the termination of the plaintiff's brand distributorship agreement which expired on May 31, 1974, pursuant to notice given plaintiff prior to enactment of the Allocation Act, was not prohibited by the Allocation Act or applicable FEA regulations.

The notice of termination given Razumic and the actual expiration of the service station lease in the instant case all occurred prior to enactment of the Allocation Act and the adoption of the regulations involved herein. As in *United States v. California*, Em.App., 504 F.2d 750 (1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975), wherein the Cost of Living Council's effort to continue its control over the economic conduct of parties after the expiration of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (1976 Supp.) was rejected by this court, the FEA may not, without specific legislative authority, extend its controls retroactively over the conduct of parties prior to the enactment of the Allocation Act.

This court has previously held, in *De-Rieux v. Five Smiths, Inc.*, Em.App., 499 F.2d 1321 (1974), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), that the Economic Stabilization Act of 1970 (Stabilization Act), 12 U.S.C. § 1904, note (1976 Supp.), and § 210 of the Stabilization Act, as amended, did not "create a private right of action for Phase I violations which occurred prior to December 22, 1971, the date on which § 210 was enacted." 499 F.2d at 1336. In a similar case involving the purchase of football game tickets prior to the 1971 amendments to the Stabilization Act, which created the private right of action under Section 210(a) for violations of the Stabilization Act, the court held that the plaintiffs had no cause of action based on the amended Stabilization Act, since the 1971 amendments were enacted 4½ months after the plaintiffs' purchase and receipt of their tickets. *Fagundez v. Oakland Raiders Professional Football Club*, Em.App., 498 F.2d 1394 (1974). The court there stated:

> Statutes are given only prospective application unless there is a clear and unambiguous legislative intent that they are to operate retroactively. *Hassett v. Welch*,

303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938); *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Soria v. Oxnard School District Board of Trustees* (9 Cir. 1972) 467 F.2d 59, 60.

498 F.2d at 1395.

Most importantly here, the Emergency Petroleum Allocation Act of 1973, as amended, never authorized the FEA to allocate and control ARCO's service station property, which the FEA attempted to do by the issuance of the Remedial Order in controversy.

Judgment AFFIRMED.

# UNITED STATES COURT OF APPEALS

## Fifth Circuit

___

## DECISIONS WITHOUT PUBLISHED OPINIONS

The following cases have been decided without formal opinion prepared for publication in the permanent law reports:

| Title | Docket Number | Date of Decision | Disposition | Appeal from and Citation (if reported) |
|---|---|---|---|---|
| * Alabama Exchange Bank v. U. S. | 75–3917 | 5/28/76 | REVERSED AND RE-MANDED *** | M.D.Ala., 400 F.Supp. 92 |
| Amoco Production Co. v. Dresser Engineering Co. of Oklahoma | 75–1902 | 5/14/76 | AFFIRMED | E.D.Tex., 390 F.Supp. 673 |
| * Barriett v. Estelle | 75–3860 | 5/26/76 | AFFIRMED *** | W.D.Tex. |
| * † Basila Mfg. Co., Inc. v. Bank of Leakesville | 76–1281 | 5/28/76 | AFFIRMED | S.D.Ala. |
| † Bell v. U. S. | 74–3943 | 5/20/76 | AFFIRMED *** | N.D.Fla. |
| † Brewster v. State | 75–4484 | 5/14/76 | AFFIRMED | M.D.Fla. |
| * † Brown v. Ricketts | 76–1215 | 5/28/76 | AFFIRMED | N.D.Ga. |
| † Bush v. Roadway Express, Inc. | 74–4211 | 5/21/76 | AFFIRMED | S.D.Tex. |
| * † Carter v. Dolce | 75–3892 | 5/21/76 | AFFIRMED | W.D.Tex. |
| * Chambers v. Estelle | 75–3859 | 5/26/76 | AFFIRMED *** | W.D.Tex. |
| Dada v. Immigration and Naturalization Service | 75–3891 | 5/14/76 | AFFIRMED | I.N.S., Fla. |
| * Deal v. Estelle | 75–3858 | 5/26/76 | AFFIRMED *** | W.D.Tex. |
| † Dean v. United States Department of Trans-portation | 75–1568 | 5/14/76 | AFFIRMED | S.D.Fla. |
| * Dinsio v. U. S. Board of Parole | 75–4428 | 5/14/76 | AFFIRMED *** | N.D.Ga. |
| Dixon v. Georgia Indigent Legal Services, Inc. | 75–1369, 75–3195 | 5/28/76 | AFFIRMED | S.D.Ga., 388 F.Supp. 1156 |
| Farris v. Auto-Owners Insurance Co. | 75–1977 | 5/14/76 | AFFIRMED *** | N.D.Ala. |
| * Flowers v. Pelham | 76–1102 | 5/28/76 | AFFIRMED *** | S.D.Ga. |
| * † Gatlin v. McMunn | 76–1367 | 5/28/76 | AFFIRMED | N.D.Ga. |
| * † Goodman v. U. S. | 76–1702 | 5/28/76 | AFFIRMED | M.D.Ga. |
| * Hatfield v. Jones | 75–3955 | 5/24/76 | AFFIRMED *** | N.D.Tex. |
| * Holland v. U. S. | 75–3993 | 5/26/76 | AFFIRMED *** | E.D.La. |
| * Houston v. Estelle | 75–3012 | 5/20/76 | REVERSED AND RE-MANDED | E.D.Tex. |
| * † Jackson v. Smith | 76–1132 | 5/20/76 | AFFIRMED | W.D.Tex. |
| * McNamara v. Wainwright | 75–4181 | 5/18/76 | AFFIRMED | S.D.Fla. |

## DECISIONS WITHOUT PUBLISHED OPINIONS—Continued

| Title | Docket Number | Date of Decision | Disposition | Appeal from and Citation (if reported) |
|---|---|---|---|---|
| † Mosher Steel Co. v. N. L. R. B. | 75–3492 | 5/14/76 | ENFORCED | N.L.R.B., Tex and La. |
| Pace Academy, Inc. v. Secretary of Labor of U. S. | 75–1789 | 5/14/76 | AFFIRMED | N.D.Ga. |
| * Palmer v. Estelle | 75–3436 | 5/18/76 | AFFIRMED *** | W.D.Tex. |
| * Paquet v. U. S. | 76–1368 | 5/28/76 | AFFIRMED *** | E.D.La. |
| * Perry v. Hopper | 75–4256 | 5/18/76 | AFFIRMED | M.D.Ga. |
| * Pioneer National Title Ins. Co. v. Salter | 75–4033, 76–1102 | 5/28/76 | AFFIRMED *** | S.D.Ga. |
| * † Realty Properties Building, Ltd v. American Savings Bank | 76–1100 | 5/28/76 | AFFIRMED | N.D.Ala. |
| Richmond v. Amoco Production Co. | 75–1902 | 5/14/76 | AFFIRMED | E.D.Tex., 390 F.Supp. 673 |
| * † Saintil v. Immigration and Naturalization Service | 76–1011 | 5/20/76 | AFFIRMED | I.N.S., Fla. |
| * Salter v. Pelham | 75–4033 | 5/28/76 | AFFIRMED *** | S.D.Ga. |
| † Southeastern Hose, Inc. v. Imperial-Eastment Corp. | 75–1326 | 5/14/76 | AFFIRMED | N.D.Ga. |
| † Sylvar v. Parish of Jefferson | 75–1783 | 5/14/76 | AFFIRMED | E.D.La. |
| * † Thomas v. U. S. | 75–4126 | 5/18/76 | AFFIRMED | W.D.Tex. |
| * † Usery v. Collura | 75–3605 | 5/20/76 | AFFIRMED | E.D.La. |
| * † U. S. v. Adkins | 75–4153 | 5/24/76 | AFFIRMED | M.D.Ga. |
| * † U. S. v. Armento | 76–1198 | 5/26/76 | AFFIRMED | M.D.Fla. |
| * † U. S. v. Branch | 76–1004 | 5/18/76 | AFFIRMED | M.D.Ala. |
| U. S. v. Burnstine | 75–2406 | 5/14/76 | AFFIRMED | S.D.Fla. |
| * † U. S. v. Harrington | 75–4274 | 5/14/76 | AFFIRMED | M.D.Ga. |
| * † U. S. v. Mauldin | 76–1147 | 5/18/76 | AFFIRMED | M.D.Ala. |
| * † U. S. v. Maynard | 75–3903 | 5/20/76 | AFFIRMED *** | N.D.Miss. |
| * † U. S. v. Murphy | 75–4161 | 5/28/76 | AFFIRMED | N.D.Miss. |
| * † U. S. v. Pinson | 76–1264 | 5/26/76 | AFFIRMED *** | N.D.Tex. |
| * † U. S. v. Polston | 75–4273 | 5/14/76 | AFFIRMED | S.D.Fla. |
| * † U. S. v. Renteria | 75–3945 | 5/26/76 | AFFIRMED | W.D.Tex. |
| † U. S. v. State of Florida Department of Transportation | 74–3943 | 5/20/76 | AFFIRMED *** | N.D.Fla. |
| * † U. S. v. Wright | 76–1109 | 5/21/76 | AFFIRMED | E.D.Tex., 405 F.Supp. 1236 |
| † Willis v. Sumter County Board of Education | 75–1133 | 5/20/76 | AFFIRMED | N.D.Ala. |

\* Summary Calendar case; Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

\*\*\* Opinion contains citation(s) or special notations.

† Local Rule 21 case; see NLRB v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 430 F.2d 966.

# UNITED STATES COURT OF APPEALS

## Fifth Circuit

### DENIALS OF REHEARING EN BANC

(Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12)

Group 1—Denials where no member of the panel nor Judge in regular active service on the Court requested that the Court be polled on rehearing en banc.

Group 2—Denials after a poll requested by a member of the panel or a Circuit Judge in regular active service.

Group 3—Denials on the Court's own motion after a poll requested by a member of the panel or a Circuit Judge in regular active service.

| Title | Docket Number | Date of Denial | Citation of Panel Decision |
|-------|---------------|----------------|----------------------------|
| GROUP 1 | | | |
| African Neptune, Steamship ............74–3940 | | 5/20/76 | S.D.Ga., 530 F.2d 7 |
| Biotronik Meb-Und Therapiegerate GMBH Ingenieurburo v. Concept, Inc.....................................74–4162 | | 5/25/76 | M.D.Fla., 530 F.2d 973 |
| Carter v. Moss .........................75–4316 | | 5/17/76 | S.D.Tex., 531 F.2d 573 |
| Concept, Inc. v. Biotronik Sales, Inc. ......74–4162 | | 5/25/76 | M.D.Fla., 530 F.2d 973 |
| Dumont v. Estelle .....................74–2903 | | 5/21/76 | S.D.Tex., 513 F.2d 793 |
| Farrell Lines, Inc. v. Jones ..............74–3940 | | 5/20/76 | S.D.Ga., 530 F.2d 7 |
| Jones v. Fidelity & Deposit Company of Maryland .........................75–3096 | | 5/19/76 | N.D.Tex., 530 F.2d 64 |
| National Wildlife Federation v. Coleman .........................75–3256 | | 5/19/76 | S.D.Miss., 529 F.2d 359 |
| Polanica, SS ..........................74–3530 | | 5/19/76 | S.D.Ala., 529 F.2d 1166 |
| Serafin Topic .........................74–3530 | | 5/19/76 | S.D.Ala., 529 F.2d 1166 |

## DENIALS OF REHEARING EN BANC—Continued

| Title | Docket Number | Date of Denial | Citation of Panel Decision |
|---|---|---|---|
| GROUP 1—Continued | | | |
| Smart v. Jones | 75–3096 | 5/19/76 | N.D.Tex., 530 F.2d 64 |
| Termar Navigation Company, Inc. v. SS Polanica | 74–3530 | 5/19/76 | S.D.Ala., 529 F.2d 1166 |
| U. S. v. Chittenden | 75–1874 | 5/26/76 | E.D.La., 530 F.2d 41 |
| U. S. v. Delaney | 75–3360 | 5/18/76 | S.D.Tex., 530 F.2d 975 |
| U. S. v. Gomez | 75–2415 | 5/26/76 | S.D.Tex., 529 F.2d 412 |