TEMPLETON'S SERVICE, INC., et al.,
Plaintiffs-Appellees,

v.

MOBIL OIL CORPORATION,
Defendant-Appellant.

No. 6–23.

Temporary Emergency Court of Appeals.

Argued Jan. 15, 1980.
Decided June 10, 1980.

Donald B. Miller, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., with whom Francis A. Rowen, Jr., Mobil Oil Corporation, New York City, was on the brief for the defendant-appellant.

Jerry S. Cohen, Kohn, Milstein & Cohen, Washington, D. C., with whom Michael D. Hausfeld, Washington, D. C., of the same firm, was on the brief for plaintiffs-appellees.

Before GRANT, LARSON and PECK, Judges.

GRANT, Judge.

Larson, District Judge, concurred and filed opinion.

Plaintiffs are four Mobil Oil Corporation (Mobil) "N"[1] dealers who resell gasoline products purchased from Mobil. They alleged that Mobil violated Federal Energy Administration (FEA) regulations by withdrawing certain allowances that were being paid to plaintiffs per gallon of gasoline on May 15, 1973. It is the contention of plaintiffs that they and other Mobil N dealers receiving such allowances comprised a "class of purchaser" distinct from other Mobil N dealers not receiving such allowances and also distinct from Mobil "OG&L" dealers[2] in the Detroit metropolitan area. Plaintiffs further contended that their allowances were "customary price differentials" within the meaning of 10 C.F.R.

---

1. Mobil's term for service station dealers who own their stations or who lease them from someone other than Mobil.

2. Mobil's term for service station dealers who lease their stations from Mobil.

§ 212.31.[3] Plaintiffs claimed that their allowances were attributable to differences in type of purchaser and location between themselves and all other Mobil dealers.

All Mobil retail dealers—both N and OG&L—in the Detroit resale district were charged the same price for gasoline, i. e., the dealer tankwagon price. Those N dealers who received a competitive allowance paid the full dealer tankwagon price but received a monthly refund based upon the number of gallons of gasoline purchased during the month.

The basis of plaintiffs' complaint in the district court, as it had been in the earlier administrative proceeding which they had instituted, was the allegation that Mobil improperly withdrew their respective allowances on gasoline purchased from Mobil. In fact, the Pre-trial Order, which controlled the course of the trial, defined plaintiffs' claim as follows:

Plaintiffs' claim. The withdrawal of allowances being paid to the plaintiffs per gallon of gasoline on May 15, 1973, was a violation of regulations promulgated by the Federal Energy Office (now Federal Energy Administration) which required the defendant to maintain customary price differentials in effect as of that date for a class of purchasers, of which plaintiffs are a part, consisting of all Mobile "N" dealers (those owning their stations as opposed to those who leased their stations) who received allowances from defendant.

That Pre-Trial Order further framed plaintiffs' statement of the legal issues involved as follows:

A. Plaintiffs' statement of legal issues.

1. Whether all N dealers in the Detroit Resale District who received allowances as of May 15, 1973 is the appropriate "class of purchaser" for the purpose of 10 CFR § 212.31.

\* \* \* \* \* \*

5. Whether defendant violated FEA regulations, 10 CFR § 212.1, et seq., requiring Mobil to maintain customary price differentials in effect as of May 15, 1973 for a class of purchasers, of which plaintiffs are a part, consisting of all Mobil N dealers in the Detroit Resale District who received an allowance from Mobil, by withdrawing said allowance.

It was upon the foregoing factual and legal issues that the case proceeded to trial in the district court. In opening statement to the court, plaintiffs stated that they would prove:

(That) these were their dealers; that they had contracts; that they were receiving the allowances; that the allowances were withdrawn; that the allowances were in effect on May 15 of 1973 are matters which for the most part, constitute our prima facie case.

We are showing primarily that these were dealers; that they were a separate class of purchaser by virtue of being dealers who received competitive allowances from this district, and as a result, the defendant, Mobil was under a duty to compute a weighted average for that class of purchasers. . . .

Mobil contended that plaintiffs' allowances at issue here were granted solely for competitive reasons and, therefore, were not "cost justified" customary price differentials as defined in the Regulations.[4] Mobil argued that the withdrawal of plaintiffs' respective competitive allowances in the summer and fall of 1973, at the time of the gasoline shortages created by the Arabian oil embargo, was proper and necessary because the competitive market conditions which gave rise to such allowances no longer existed. Those shortages had first brought about voluntary regulation and then federal regulations of gasoline allocation.

---

**3.** The FEA's Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212.31, define "customary price differential" as follows:

Customary price differential includes a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery.

**4.** See note 3, *supra*.

These plaintiffs had first submitted their written protest to the Federal Energy Administration (FEA) and, upon the basis of that prior submission to the FEA, Mobil moved to dismiss the complaint in this case for plaintiffs' failure to exhaust administrative remedies. That motion was denied by the district court in a Memorandum and Order dated October 16, 1975.[5] Although unknown to Mobil or the district court at the time of the district court's Order, the FEA had responded to plaintiffs' charges, had denied that Mobil's withdrawals of the allowances were in violation of FEA price regulations, and had invited each of the plaintiffs to submit any documentation they had which would indicate that Mobil had granted the competitive allowances for cost-justified reasons. Plaintiffs did not respond to this invitation from the FEA.

This case was tried to the court in March 1977. Thereafter, Judge Joiner's August 2, 1977 Memorandum Opinion acknowledged at the outset the precise nature of plaintiffs' claim:

> . . . This is a suit for monetary damages brought by four of one hundred twenty Detroit area owner-dealers of Mobil Stations [hereinafter referred to as "N" dealers] alleging that the Mobil Oil Corporation ["Mobil"] violated certain of these regulations by discontinuing certain "competitive discounts" on purchases by these "N" dealers that had been in effect on May 15, 1973 under retail dealer contracts.
>
> It is the claim of the plaintiffs that in the Detroit Resale District, "N" dealers who were receiving "competitive discounts" as of May 15, 1973 constitute a "class of purchaser" as defined by FEA regulations and that these "competitive discounts" given to the members of this class constituted a "customary price differential" as used in those regulations. Plaintiffs contend that the failure of Mobil to continue this "customary price differential" to this "class of purchaser" violated a regulation of the FEA requiring that such price differentials be maintained.

In that Memorandum and Order the court held against plaintiffs' claim that the appropriate class of purchaser was N dealers receiving allowances and that their allowances were "cost justified." The court found (Finding No. 8) that "the Detroit resale district is one of Mobil's most competitive marketing areas in the United States" and, in holding that the allowances were competitive in nature, stated:

> The court, however, finds no evidence to support the argument that the discounts given to this smaller number of "N" dealers (the evidence shows that 60 of the 120 "N" dealers in the Detroit Resale Area received such discounts) were based on anything other than the necessity of meeting bona fide competition from other oil companies wanting to have these stations sell their own brand of gasoline.

■ Inasmuch as these allowances were truly competitive in nature, they were properly withdrawn by Mobil at the time of the shortages created by the Arabian oil embargo, that is to say, at the time when the competitive conditions which originally prompted the discounts no longer existed. At that point, having denied the relief sought by plaintiffs and having disposed of the issues herein, the court should have entered final judgment for the defendant and against the plaintiffs.[6]

The district court, however, then proceeded, *sua sponte*, to decide a claim that was never presented to it. It was neither pleaded nor tried. The court concluded that Mobil's N dealers and OG&L dealers comprised two different classes of purchasers because there existed hidden "cost-justified", "customary price differentials" between them and that Mobil should have computed a separate base price for each class.

---

5. Reported at 402 F.Supp. 368 (E.D.Mich.1975).

6. See this court's opinion in *Mr. Magic Car Wash v. Department of Energy*, 596 F.2d 1023 (TECA) 1978. See also *Merry Twins, Inc., et al. v. Exxon Corporation*, 611 F.2d 874 (TECA) 1979.

In arriving at that conclusion, the district court found:

> Finding No. 22. Mobil has no expenses relating to the upkeep, ownership or leasing of property on which the stations of plaintiffs and other N dealers are located . . . .
>
> Finding No. 31. Mobil realized cost savings and advantages from doing business with N dealers which cost savings and advantages were not realized when doing business with OG&L dealers.

Those costs "relating to the upkeep, ownership or leasing of property" which the N dealers confront could only relate to or be compared with the rentals which the OG&L dealers were required, by separate contracts, to pay to Mobil. But this court has heretofore held in *Shell v. FEA*[7] that there is no relationship (under the Emergency Petroleum Allocation Act of 1973 (EPAA))[8] between service station rents and gasoline prices. This court in *Shell* held that the FEA does not have authority to control rents charged for service station property. As the district court stated in *Shell*, (affirmed here on appeal):

> Unlike the Economic Stabilization Act of 1970, the Allocation Act has not given FEA specific authority to control rents of service station properties. Only the authority to control gasoline prices has been given. . . .
>
>   *   *   *   *   *   *
>
> The FEA's position is that the rents charged to service station operators are so inextricably interwoven with the prices which they pay for gasoline from Shell that the regulation of prices would be frustrated unless the FEA has also the authority to control the rents charged. The only factual basis for the argument is that some of the rents are expressed as a flat rate in cents per gallon and are therefore a combined charge to the retailer by the supplier for the purchasing and retailing of gasoline. *It is, however, common in many businesses to express rent on a basis which is related to sales, and Shell's service station rentals and its gasoline sales are contracted for under separate agreements.* . . . (Emphasis supplied.)
>
>   *   *   *   *   *   *
>
> The mere fact that many leases provide that rent is to be determined on the basis of cents per gallon does not make prices and rents inextricably woven together so that they become legally identical. *Rents are not prices*; Congress recognized the difference in the Stabilization Act by providing for both. In the Allocation Act, Congress included prices but excluded rents. . . . (Emphasis supplied.)

400 F.Supp. 968–970.

In reaching the conclusion of two classes of purchasers, the district court here relied upon Example 6 in FEA Ruling 1975–2. However, our ruling in *Shell, supra,* coming as it did after the promulgation of Ruling 1975–2, effectively invalidated any effort to bring filling station rentals, or costs of the "upkeep, ownership or leasing of property" into the ambit of the Emergency Petroleum Allocation Act.

We hold that, under the applicable FEA regulations, all Mobil retail service station dealers, both N dealers and OG&L dealers, in the Detroit resale district comprise one class.

In view of our holding here, we do not reach the other issues raised by appellant in this appeal.

The judgment of the district court is reversed, with instructions to enter judgment for the defendant and against the plaintiff.

REVERSED.

LARSON, District Judge, concurring.

I respectfully join in the decision insofar as it holds that final judgment for the

---

7. *Shell Oil Company v. Federal Energy Administration,* 400 F.Supp. 964 (S.D.Texas 1975), aff'd 527 F.2d 1243 (TECA) 1975. *See also Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363, 1370 (TECA) 1976.

8. 87 Stat. 628, 15 U.S.C. See 751, *et seq.* (1975 Supp.).

defendant and against the plaintiffs should have been entered once the District Court determined that the allowances were competitive in nature and therefore properly withdrawn by the defendant. My review of the record indicates that the claim that the Mobil N dealers and the Mobil OG&L dealers constituted separate classes of purchaser was not properly before the District Court. Our opinion need go no further. The discussion of the majority regarding FEA Ruling 1975–2 is, however, unnecessary to the resolution of this case.

Furthermore, it is my opinion that this Court's decisions in *Shell Oil Co. v. Federal Energy Administration,* 527 F.2d 1243 (TECA 1975), and *Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363 (TECA 1976), would not have foreclosed the result reached by the District Court herein had the claim been properly before the court. Ruling 1975–2 does not represent an attempt to control rents, but rather represents an attempt to define who constitute the appropriate classes of purchaser under the energy regulations. This Court in the *Shell Oil* case recognized that some consideration of the status of the dealer vis-a-vis the supplier-manufacturer of the gasoline would be necessary in some circumstances:

> "The FEA contends that these [rent] regulations prevent the frustration of its petroleum price regulations. But, while the rent charged by the lessor for real property used in retailing gasoline will affect the total cost of the retailer-lessee's operation, it is only when the lessor of the real property and the supplier of the gasoline to be marketed at that site are one and the same that any increase in rent could possibly be construed as a hidden increase in the price of gasoline. The rent regulations promulgated by the FEA are not limited to this situation." 527 F.2d at 1246.

By implication, therefore, when the lessor of property is also the gasoline supplier for a lessee-dealer, that relationship can have an impact on the pricing of the gasoline. Ruling 1975–2 recognizes as much. It does not allow the FEA (now the DOE) to regulate the rent charged but it does require in some circumstances that those dealers who rent from the supplier be treated as a separate class of purchaser.

A principal function of the class of purchaser concept is to preserve the price distinctions among purchasers that customarily existed under free market conditions. By construing practical distinctions based upon the relationship between the dealer and the supplier of gasoline to fall within the proscription on regulating rents, this Court will further hamper the DOE in its efforts to carry out the mandate of Congress to effectively regulate gasoline prices in the United States.